UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

LINETTE WILLIAMS-GRANT,

    Plaintiff,

    v.    Case No. 11-C-1051

WISCONSIN BELL, INC.,

    Defendant.

DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 23) AND DISMISSING CASE

Plaintiff Linette Williams-Grant ("Williams-Grant") claims that defendant Wisconsin Bell, Inc. ("Wisconsin Bell") violated the Family and Medical Leave Act ("FMLA") by interfering with, restraining and denying the exercise of her statutory federal rights and terminating her employment. Wisconsin Bell moves for summary judgment on the ground it terminated Williams-Grant's employment on an "honest suspicion" that Williams-Grant misused her FMLA leave. For the reasons set forth below, Wisconsin Bell's motion for summary judgment will be granted and this case will be dismissed.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend

each element of its cause of action, showing that there is a genuine issue for trial. *Id.*, at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.*, at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

## FACTS

Williams-Grant worked for Wisconsin Bell from June 5, 1995, to December 7, 2009. (Doc. 25, Ex. B at 38.) At all relevant times, she was a Telecommunications Specialist at the company's Network Translation Center ("NTC") in Milwaukee, Wisconsin. (Doc. 27, Ex. A ¶ 4.) This position is a sedentary position. (Doc. 25, Ex. A ¶ 6.) However, on December 7, 2009, Wisconsin Bell terminated Williams-Grant's employment for FMLA fraud and for failing to cooperate in a company investigation. (Doc. 25, Ex. A ¶ 32-33.)

Williams-Grant suffers from numerous medical conditions, including back pain, hip pain, osteoarthritis, radiculopathy, anxiety and panic disorder as well as chronic depression. (Doc. 25, Ex. E at 10-12.) These conditions lead to hip and thigh pain, most notably when standing and walking, and lower back pain, particularly with prolonged sitting

2

and standing. As a result, Williams-Grant's ability to perform daily activities is affected. (Doc. 25, Ex. E at 11-12.) From 2004 to 2008, Williams-Grant was seen by her personal physician, Dr. DeBoe, or someone in his office approximately once a month. (Doc. 25, Ex. E at 10.) According to Dr. DeBoe, it was unreasonable for Williams-Grant to go to work on days when she suffered from intractable pain. (Doc. 25, Ex. E at 13-14.) In addition, Dr. DeBoe certified that Williams-Grant may need up to eight days of intermittent FMLA leave per month in 2008, and nine days of intermittent FMLA leave per month, or three days per week, in 2009. (Doc. 25, Ex. E at 15, 26.)

Due to her medical conditions, Williams-Grant began using FMLA leave from Wisconsin Bell in 2003 or 2004. (Doc. 27, Ex. A ¶ 2.) Wisconsin Bell did not question her FMLA leave use or deny her FMLA leave use until 2009. (Doc. 27, Ex. A ¶ 16, 24-25.) In 2008, Rita Solomon-Moore, Williams-Grant's supervisor and a manager in the company's Network Translation Center, created an Employee Discussion Form after Williams-Grant showed up late to work, and stated that "Linette is currently training and continued absences will have negative impact on her being successful in this position." (Doc. 25, Ex. A ¶ 9, Ex. 1 at 16.) However, this absence/tardiness did not involve FMLA leave. (Doc. 25, Ex. A ¶ 9, Ex. 1 at 16.)

Williams-Grant claims that Solomon-Moore told her that she did not have intermittent FMLA leave available in 2008, although intermittent FMLA leave remained available to her. (Doc. 27, Ex. 1 ¶¶ 11-13.) Solomon-Moore had relied on Wisconsin Bell's FMLA status tracker tool, which showed that Williams-Grant did not have leave remaining. (Doc. 25, Ex. D at 9-11.)

3

AT&T's FMLA Processing Unit ("FPU") is responsible for processing all requests for leave under the FMLA. (Doc. 25, Ex. C ¶ 3.) When an employee of an AT&T company requests FMLA leave, the employee's manager, or another manager, notifies the FPU by completing and sending an electronic form which states, among other things, the date(s) and hours of leave requested. (Doc. 25, Ex. E ¶ 5.) The FPU then determines whether the employee is entitled to the FMLA leave, and notifies the employee whether the request is approved or denied, along with the reasons for any denial. (Doc. 25, Ex. E ¶ 6-7.)

In December 2008, Solomon-Moore, became suspicious of William-Grant's FMLA leave use after she learned from a senior technical manager in the NTC that Williams-Grant asked when her annual FMLA allotment would replenish. (Doc. 25, Ex. D at 6, 14-15.) Solomon-Moore also noticed that when Williams-Grant had used her entire FMLA annual allotment, she stopped calling in sick; she resumed calling in sick and requesting FMLA coverage for her absences after her annual allotment was replenished. (Doc. 25, Ex. A ¶ 8.)

In February of 2009, Solomon-Moore contacted Human Resources ("HR") to ask what was needed to request an investigation of Williams-Grant's FMLA leave use. (Doc. 25, Ex. A ¶ 8.) The HR department advised Solomon-Moore to track Williams-Grant's FMLA leave use to determine whether any suspicious patterns emerged. (Doc. 25, Ex. D at 17.) On August 5, 2009, after tracking Williams-Grant's FMLA leave use on a calendar, Solomon-Moore sent a request to HR that Williams-Grant's FMLA use be investigated based on a pattern in Williams-Grant's absences and FMLA usage throughout 2009. (Doc. 25, Ex. D at 18, Exs. 3-4.)

4

Solomon-Moore claimed that this pattern included requesting FMLA leave on Saturdays (when it was a scheduled work day for her), as well as days immediately prior to or following Williams-Grant's scheduled days off. (Doc. 25, Ex. A ¶ 9.) Solomon-Moore interpreted this pattern as indicative of Williams-Grant's efforts to maximize her days off. (*Id.*) Solomon-Moore also noted that Williams-Grant did not call in sick on days she was scheduled to work a shift paying a premium wage differential. (*Id.*)

Solomon-Moore's request for investigation was forwarded from HR to the FPU and was reviewed by then Senior Benefits Analyst Joe Pena. (Doc. 25, Ex. C ¶¶ 11-13.) Joe Pena concluded that the patterns reflected in Williams-Grant's FMLA use justified an investigation into whether she was using FMLA leave properly. (Doc. 25, Ex. C ¶ 14.) Accordingly, on August 11, 2009, Pena requested that the company's Asset Protection Department investigate Williams-Grant's FMLA leave use. (Doc. 25, Ex. C ¶ 15.)

The Asset Protection Department is responsible for investigating potential violations of the company's Code of Business Conduct ("COBC"). (*Id.*) The COBC prohibited fraudulent conduct, required employees to tell the truth, and required employees to cooperate in investigations. (Doc. 25, Ex. B at 47-48, 50; Ex. 8 at 11, 15, 37.) Violations of the COBC could lead to discipline up to and including termination. (Doc. 25, Ex. B at 44-45, Ex. 8.)

The two days in question for this lawsuit are Saturday, August 29, 2009, and Friday, October 2, 2009. During both of these days, Williams-Grant did not report for her shift and requested a full day of FMLA leave to cover the absence. (Doc. 25, Ex. B at 61, 75-76.) Consistent with the pattern identified by Solomon-Moore, Williams-Grant was scheduled to be off work the preceding Thursday, August 27, had scheduled a vacation day for

5

Friday, August 28, and was not scheduled to work the following two days, Sunday, August 30, and Monday, August 31. (Doc. 25, Ex. A ¶ 11.) For the second day in question, Williams-Grant requested FMLA leave the following day, Saturday, October 3, and was scheduled off the next two days, Sunday, October 4, and Monday, October 5. (Doc. 25, Ex. A ¶ 13.) Williams-Grant did not recall the symptoms she was experiencing on August 29 or October 2, or what symptoms prevented her from performing her job. (Doc. 25, Ex. B at 66-67, 78-79.)

After Williams-Grant called in sick on these days, Solomon-Moore notified Asset Protection, who in turn notified a third-party investigator retained by Asset Protection to observe Williams-Grant's activities on these days. (Doc. 25, Ex. A ¶ 10; Doc. 25, Ex. C ¶ 16.) On August 29, 2009, Williams-Grant left her home at approximately 10:30 a.m. and her husband drove her to Christian Faith Fellowship Church East. (Doc. 25, Ex. C ¶ 16, Ex. 1; Doc. 25, Ex. B at 67-68.) Williams-Grant remained at the church for approximately one hour, according to her, to receive prayer. (Doc. 27, Ex. A ¶ 53.)

On October 2, 2009, Williams-Grant left her home and her husband drove her to a gas station. (Doc. 27, Ex. A ¶ 66.) Williams-Grant walked into the gas station with a walking cane to pay for gas. (Doc. 27, Ex. A ¶ 67-68.) The third-party investigator reported to Wisconsin Bell that he observed Williams-Grant travel in the vehicle from Milwaukee to Lake Delton, Wisconsin, from 11:20 a.m. to 1:31 p.m. (Doc. 25, Ex. C ¶ 16, Ex. 1.) The investigator's report indicates that Williams-Grant was observed entering a private residence in Lake Delton at 1:31 p.m., and remained there until the surveillance concluded at 5:30 p.m., about which time Williams-Grant's shift would have ended that day. (Doc. 25, Ex. C ¶ 16, Ex. 1.)

6

Williams-Grant denies traveling to Lake Delton on October 2, 2009. (Doc. 27, Ex. A ¶ 69.) She does not recall where she and her husband traveled after leaving the local gas station. (Doc. 27, Ex. A ¶ 69.) Williams-Grant owned a 2002 Chevrolet Express van, which had heated seats. (Doc. 27, Ex. A ¶ 63.) These heated seats relieved Williams-Grant's back pain, hip pain, neck pain and head pain. (Doc. 27, Ex. A ¶ 64.) On October 2, 2009, Williams-Grant claims that she used the heated seats to relieve her medical conditions. (Doc. 27, Ex. A ¶ 65.)

Dr. DeBoe, Williams-Grant's physician, testified that Williams-Grant could have obtained that same relief from using a heating pad in her chair at work. (Doc. 25, Ex. E at 31.) However, Williams-Grant did not see or call Dr. DeBoe on either August 29, 2009, or October 2, 2009. (Doc. 25, Ex. E at 32, 33.) Therefore, Dr. DeBoe cannot give an opinion as to whether Williams-Grant was capable of performing her job on either of those days. (Doc. 25, Ex. E at 32, 33.)

After AT&T obtained the investigative logs and videotaped observations of Williams-Grant, Jeffrey Zambo, a manager in the Asset Protection Department, provided Dr. Jess Bond with the logs. (Doc. 25, Ex. C ¶ 17.) Dr. Bond is affiliated with an outside company from whom the FPU requests medical opinions. (Doc. 25, Ex. C ¶ 18.) Dr. Bond reviewed the investigative reports and video surveillance and concluded that Williams-Grant could have performed her work duties on August 29, and October 2, 2009. (Doc. 25, Ex. C ¶ 20, Ex. 2.)

On October 21, 2009, Zambo and Solomon-Moore met with Williams-Grant to question her about her activities on August 29 and October 2, 2009, and to review with her the relevant portions of the video surveillance. (Doc. 25, Ex. A ¶ 14.) Prior to this Asset

7

Protection interview, Solomon-Moore discovered a blog posting stating that Williams-Grant was taking classes at the Christian Faith Fellowship Church East on Saturdays.[1] (Doc. 25, Ex. A ¶ 15, Ex. 2.) During the interview, Williams-Grant denied affiliation with the church and did not disclose that she had been taking classes there. (Doc. 25, Ex. A ¶ 16.)

Following the October 21, 2009 interview, Solomon-Moore suspended Williams-Grant pending further investigation. (Doc. 27, Ex. A at 107.) On October 29, 2009, Pena concluded that Williams-Grant was not too incapacitated to work on October 2, 2009, based on the observations of her activities, her interview summary, and Dr. Bond's opinion. (Doc. 25, Ex. C ¶ 21, Ex. 3.) Hence, Pena denied Williams-Grant's request for FMLA leave to cover her absence that day. (Doc. 25, Ex. C ¶ 21, Ex. 3.)

In early November 2009, Solomon-Moore received an investigation report prepared by Zambo, which summarized the surveillance observations she had reviewed, Williams-Grant's interview, and Dr. Bond's opinion. (Doc. 25, Ex. A ¶ 20, Ex. 3.) On November 16, 2009, Solomon-Moore decided to suspend Williams-Grant pending termination for FMLA fraud and her failure to be forthcoming during the company's investigation, both violations of the company's COBC. (Doc 25, Ex. A ¶ 21.) This decision was based on Pena's decision to deny Williams-Grant's request for FMLA leave on October 2, 2009, the Asset Protection interview, the blog posting, the surveillance video, and the information contained in Zambo's investigation report. (Doc. 25, Ex. A ¶ 21.)

Solomon-Moore believed that Williams-Grant had not cooperated in the company's investigation because she had represented that she had gone to Christian Faith Fellowship

---

[1]There might be an issue of the blog being hearsay as Williams-Grant never officially admitted writing the blog, however: 1) Williams-Grant has not objected to the use of the blog as hearsay; also, 2) the blog is titled "miraclebootcamplinetteg," which is Williams-Grant's first name, the blog states "me and Lana" (Williams-Grant's daughter), and Williams-Grant admitted that the blog refers to her. Therefore, it is a party admission and not hearsay.

8

Church East to receive prayer and had no affiliation with the church, when the blog posting, written in the first-person and referring specifically to "Linette," expressly stated Williams-Grant was attending classes at the church on Saturdays. (Doc. 25, Ex. A ¶ 23.) Furthermore, Solomon-Moore did not believe that Williams-Grant was honest when she claimed no memory of her day trip to Lake Delton on October 2, 2009, particularly when she was shown the video surveillance just weeks later. (Doc. 25, Ex. A ¶ 23.)

The company's Human Resources and Labor Relations managers, as well as Solomon-Moore's direct supervisor, concurred with the decision to suspend Williams-Grant pending termination. (Doc. 25, Ex. A ¶ 24.) Williams-Grant was a member of the Communications Workers of America ("CWA") union, and the terms and conditions of her employment were governed by a collective bargaining agreement between the CWA and Wisconsin Bell. (Doc. 25, Ex. B at 38.) Suspension pending termination is a contemplated discharge under the collective bargaining agreement, as Williams-Grant and her Union had the right to request a Union-Management Review Board be convened to discuss the decision before it became final. (Doc. 25, Ex. A ¶ 26.)

The Union requested that a Union-Management Review Board be convened to state a case for why the company should not terminate Williams-Grant's employment, and one was held on December 2, 2009. (Doc. 25, Ex. B at 111.) Present at the meeting was AT&T Services, Inc.'s Labor Relations Manager for the State of Wisconsin, Peggy Texeira. (Doc. 25, Ex. F at 7-8.) According to Texeira, at the beginning of the meeting Williams-Grant maintained that she had only been to Christian Faith Fellowship Church East to receive prayer. (Doc. 25, Ex. F at 21.) Solomon-Moore claims that after being confronted with the blog entry, Williams-Grant changed her story and admitted that she had been to

9

the church for a course on at least one day. (Doc. 25, Ex. A ¶ 31; Doc. 25, Ex. B at 114.) However, Williams-Grant denies having said that she had never been to the church for any reason other than prayer. (Doc. 25, Ex. B at 114.)

Following the Review Board meeting, Texeira called Christian Faith Fellowship Church East and spoke to the pastor, who confirmed that Williams-Grant had been attending a class at the church every Saturday since July 2009, including on August 29, 2009.[2] (Doc. 25, Ex. F 25-26.) Williams-Grant's FMLA leave tracking calendar shows that Williams-Grant took FMLA leave on six straight Saturdays from July 25, 2009, through August 29, 2009. (Doc. 25, Ex. A ¶ 9, Ex. 1 at 23.)

After the Review Board meeting, and learning that the church pastor told Texeira that Williams-Grant had been taking classes on Saturdays, Solomon-Moore proceeded with Williams-Grant's termination. (Doc. 25, Ex. A ¶ 32.) Solomon-Moore's basis for the termination was the same reasons she suspended Williams-Grant pending termination, as well as Williams-Grant's continued dishonesty related to taking classes at the church and her lack of explanation regarding the days in question. (Doc. 25, Ex. A ¶ 32.)

On December 7, 2009, Solomon-Moore called Williams-Grant and notified her of the company's decision to terminate her employment. (Doc. 25, Ex. A ¶ 33.) Pursuant to the company's usual practice, a letter was sent to the CWA notifying the Union that Williams-Grant's employment had been terminated effective that date. (Doc. 25, Ex. A ¶ 33, Ex. 5.) The CWA did not pursue a grievance of Williams-Grant's termination to arbitration. (Doc. 25, Ex. B at 118.)

---

[2] There may be a hearsay issue with this statement, however, hearsay is a statement used "to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). Wisconsin Bell is not providing this statement to prove that Williams-Grant attended classes at this church every Saturday, it provides this statement to prove what it honestly suspected, what it knew at the time.

10

Around January 31, 2011, Williams-Grant applied for Social Security Disability Insurance ("SSDI"). (Doc. 25, Ex. B at 13-14.) Williams-Grant understood that she would not qualify for the disability benefits unless she was unable to work. (Doc. 25, Ex. B at 15.) As part of the SSDI application process, Williams-Grant alleged an onset date of October 21, 2009; the day of her Asset Protection interview and suspension pending investigation. (Doc. 25, Ex. B at 16, 19, Exs. 3-4.) Williams-Grant represented to the Social Security Administration ("SSA") that she stopped working on October 21, 2009, because of her disabling conditions. (Doc. 25, Ex. B at 16, Ex. 3.)

On or about May 4, 2011, the SSA found Williams-Grant disabled and unable to work as of October 21, 2009. (Doc. 25, Ex. B at 18-19, Ex. 4.) She has been receiving Social Security disability payments since May 2011. (Doc. 25, Ex. B at 13.)

ANALYSIS

The FMLA allows an eligible employee with a serious health condition that renders the employee unable to perform her position to take up to twelve workweeks of leave during each twelve-month period. 29 U.S.C. § 2612(a)(1)(d). Williams-Grant claims that Wisconsin Bell violated the FMLA by interfering with, restraining and denying her FMLA rights in violation of 29 U.S.C. § 2615(a)(1) when it refused to grant her FMLA leave request on October 2, 2009, and eventually terminated her employment.

A. Williams-Grant's FMLA Interference Restraint and Denial Claim

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). To prevail on this claim, the employee must show that: (1) she was eligible for FMLA protection; (2) the employer was covered by the FMLA; (3) she was entitled to

11

leave under the FMLA; (4) she provided notice of intent to take FMLA leave; and (5) the employer denied her FMLA benefits to which she was entitled. *De La Rama v. Ill. Dept. of Human Services*, 541 F.3d 681, 686-87 (7th Cir.2008) (internal citations omitted).

An employee who takes leave under the FMLA is only entitled to reinstatement if she "takes leave under [the FMLA] for the intended purpose of the leave." 29 U.S.C. § 2614(a)(1). Therefore, an employer can defeat such claims by showing, among other things, that the employee did not take leave for the intended purpose of the leave. *Vail v. Raybestos Products Co.*, 533 F.3d 904, 909 (7th Cir. 2008). Under the FMLA, an employee "has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). Because of this regulation, the Seventh Circuit has held repeatedly that an employer has not violated the FMLA if it refused to reinstate the employee based on an "honest suspicion" that she was misusing her leave. *Vail,* 533 F.3d at 909; *Crouch v. Whirlpool Corp.*, 447 F.3d 984, 986 (7th Cir. 2006) (even an employer's honest suspicion that the employee was not using her medical leave for its intended purpose is enough to defeat the employee's substantive rights FMLA claim).

In a similar case, the Seventh Circuit determined that the employer had an "honest suspicion" that the employee was not using his leave for intended purposes, and upheld summary judgment in the employer's favor on the interference claim. *Scruggs v. Carrier Corp.*, 688 F.3d 821, 826 (7th Cir. 2012). Carrier suspected Scruggs of misusing his FMLA leave based upon prior absenteeism, and hired a private investigator to observe Scruggs on days that he requested FMLA leave. *Id*., at 826. Video surveillance revealed that Scruggs did not leave his house to care for his mother on the day in question, contrary to

12

the stated FMLA leave purpose. *Id*. When Scruggs was interviewed by Carrier, he claimed he could not recall what he did on that day, but stated that he did not misuse his FMLA leave. *Id*. Scruggs provided documentation from his mother's nursing home and doctor's office in an attempt to prove he took his mother to a doctor's appointment, but the documentation raised further suspicion. *Id*. The Seventh Circuit ruled that this was enough for Carrier to have an "honest suspicion" that Scruggs misused his FMLA leave, and did not interfere with Scruggs's FMLA rights when it terminated him. *Id*.

Here, the facts before the court establish that Wisconsin Bell had an "honest suspicion" that Williams-Grant misused her FMLA leave. Solomon-Moore became suspicious of Williams-Grant's FMLA leave use after she learned that Williams-Grant inquired when her FMLA leave would replenish, and noticed a pattern in Williams-Grant's FMLA use. As a consequence, Solomon-Moore tracked Williams-Grant's FMLA use over six months, from February 2009 to August 2009, before requesting an investigation. Then, a private investigator documented Williams-Grant's activities on August 29, 2009, and October 2, 2009. Consistent with the pattern that Solomon-Moore noticed, by taking off these two days, Williams-Grant maximized her time off at five consecutive days and four consecutive days, respectively.

The private investigator reported to Wisconsin Bell that Williams-Grant attended Christian Faith Fellowship Church East on August 29. Wisconsin Bell discovered the blog, which it reasonably believed was written by Williams-Grant, stating that Williams-Grant had been taking classes at the church on Saturdays and was working on her associates degree in Theology. Wisconsin Bell also called the pastor at the church who told Texeira that Williams-Grant had been taking classes on Saturdays since July, including on August 29.

13

Further, Williams-Grant took FMLA leave on six straight Saturdays from July 25 through August 29. From this, the record establishes that Wisconsin Bell had the honest suspicion that Williams-Grant misused her FMLA leave to take church classes.

On the second day in question, October 2, the private investigator provided a written report to Wisconsin Bell stating that Williams-Grant traveled to Lake Delton. Williams-Grant denied traveling to Lake Delton, similar to the plaintiff in *Scruggs*, and said she did not recall what she did that day. When Wisconsin Bell questioned Williams-Grant three weeks after the day in question, Williams-Grant failed to provide an explanation of what she did on that day. Hence, the uncontested facts support Wisconsin Bell's claim that it honestly suspected that Williams-Grant misused her FMLA leave on October 2 based on the investigative report and Williams-Grant's failure to provide evidence or an explanation of her activities on October 2.

Additionally, the evidence proffered by Wisconsin Bell also supports its claim that it had the honest suspicion that Williams-Grant violated the COBC by failing to cooperate with the company's investigation concerning her leave. Violating Wisconsin Bell's COBC is a legitimate and non-discriminatory ground for termination. Williams-Grant failed to disclose that she was taking classes at a church on Saturdays. She denied going to Lake Delton, but claimed she had no recollection of where she went instead. After reading the blog that appeared to have been written by Williams-Grant, and talking with the pastor of the church where Williams-Grant was attending classes, Wisconsin Bell had a factual basis for concluding that Williams-Grant failed to cooperate with its investigation.

Although the Second Amended Complaint does not assert a retaliation claim, the parties' summary judgment submissions address such a claim. Wisconsin Bell contends

14

that the honest suspicion rule only applies to an FMLA retaliation claim; however, the honest suspicion rule has been applied to retaliation as well as restraint, interference, and denial of benefits claims. *Millard v. BNSF Ry. Co.*, No. 08 C 3752, 2009 U.S. Dist. LEXIS 39822 (N.D. Ill. 2010). Williams-Grant cites *Millard* because the court ruled that summary judgment was inappropriate in his FMLA interference claim. *Id*., at *1. However, the employer in *Millard* formed its honest suspicion almost exclusively on its unauthorized contact with Millard's doctor, which the FMLA prohibits. *Id*., at *4. The court ruled that summary judgment was inappropriate because there was a question whether BNSF interfered with Millard's FMLA rights by contacting his doctor. *Id*., at *5. Here, Williams-Grant does not contend that Wisconsin Bell had unauthorized contact with Dr. DeBoe, and therefore *Millard* is inapplicable.

Williams-Grant cites another case in which the court denied summary judgment based on the employer's honest suspicion that the employee misused FMLA leave. *Nelson v. Oshkosh Truck Corp.*, No. 07 C 509, 2008 U.S. Dist. LEXIS 7275 (E.D. Wis. 2008). However, in that case, Oshkosh Truck suspected Nelson of misusing her FMLA leave because an investigator witnessed her performing activities suggesting that she would have been able to work. *Id*., at *5. However, Nelson's doctor provided clarification that the symptoms she was experiencing on those days actually did prevent her from performing her job. *Id*., at *6.

In Williams-Grant's case, Dr. DeBoe could not testify that the symptoms Williams-Grant was experiencing on the two days in question prevented her from performing her job. Further, no evidence in this case refutes Wisconsin Bell's view that Williams-Grant

15

misused her FMLA leave. The only evidence in *Nelson* was a private investigator's surveillance report, which Nelson's doctor later explained. *Id.*, at *5.

This court need not determine whether Williams-Grant in fact misused her FMLA leave. *Kariotis v. Navistar Intern. Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1997), makes this clear. The Court of Appeals ruled: "Navistar need not conclusively prove that Kariotis had misused her leave; an honest suspicion will do." *Id*. Hence, this court simply finds that there is no genuine issue of material fact that Wisconsin Bell had an honest suspicion that Williams-Grant misused her FMLA leave and failed to cooperate with the company's investigation. These determinations defeat Williams-Grant's FMLA interference claims under 29 U.S.C. § 2615(a)(1).

B. Williams-Grant's Ostensible FMLA Retaliation Claim

It is unlawful for an employer "to discharge or in any manner discriminate against" any employee for opposing any practice the FMLA makes unlawful. 29 U.S.C. § 2615(a)(2). An employee seeking to establish a retaliatory termination claim need only show that the protected conduct was a substantial or motivating factor in the employer's decision. *Lewis v. School Dist. #70*, 523 F.3d 730, 741-42 (7th Cir. 2008). An employee can show retaliation under either the direct or indirect methods of proof. *Long v. Teachers' Retirement Sys. of the State of Illinois*, 585 F.3d 344, 349 (7th Cir. 2009).

Wisconsin Bell submits that Williams-Grant is unable to establish that it terminated her employment because she used her FLMA leave, regardless of whether she uses a direct method of proof or an indirect method of proof. An employee can establish a prima facie case of retaliatory discharge under the direct method by showing that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action

16

against her; and (3) there is a causal connection between the protected activity and the employer's adverse employment action. *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 633 (7th Cir. 2009). Under the direct method, the employee is not limited to near-admissions, but also includes "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Id*. (citing *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)). Circumstantial evidence of intentional discrimination can consist of: "suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext, and other evidence which allows the jury to reasonably infer retaliation." *Kinsella v. American Airlines, Inc.*, 685 F. Supp. 2d 891, 901 (N.D. Ill. 2010) (internal citations omitted).

As with Williams-Grant's claim as discussed earlier, an employer's honest suspicion that the employee has not used her medical leave for its intended purpose is enough to defeat the employee's substantive rights FMLA claim. *Crouch v. Whirlpool Corp.*, 447 F.3d 984, 986 (7th Cir. 2006) (internal citations omitted). In *Scruggs*, the Seventh Circuit relied on the fact that Carrier approved Scruggs's FMLA leave initially, and only after learning of the possible FMLA misuse took a materially adverse employment action against Scruggs. *Scruggs*, 688 F.3d 821, 827. Therefore, the reason for Scruggs's termination was distinct from his protected activity. *Id*. The court determined that "[w]e cannot conclude from these facts that Carrier intentionally discriminated against Scruggs for taking FMLA leave. If we were to hold otherwise, virtually any FMLA plaintiff fired for misusing his leave would be able to state a claim for retaliation." *Id*.

Even if Williams-Grant could make a prima facie case for FMLA retaliation and show that she engaged in protected activity, Wisconsin Bell has presented evidence establishing

17

its honest suspicion that Williams-Grant was misusing her FMLA leave. As Williams-Grant admits, she began using FMLA leave in 2003 or 2004, and Wisconsin Bell did not question her FMLA use or deny her FMLA leave use until 2009. Only in 2009, after Wisconsin Bell received evidence that Williams-Grant was misusing her FMLA leave, did it investigate her FMLA use. As in *Scruggs*, the reason for Williams-Grant's termination was not the protected activity of using FMLA leave, as evidenced by the fact that she had taken FMLA leave for six years with no adverse employment action. Here, there is no suspicious timing as the adverse employment action by Wisconsin Bell occurred six years after Williams-Grant began taking FMLA leave.

As this court has already noted, Wisconsin Bell has documented that it had an "honest suspicion" that Williams-Grant misused her FMLA leave, and this honest suspicion is the reason for Williams-Grant's termination. Wisconsin Bell discovered from its private investigator that Williams-Grant attended church on August 29, and according to the information that Wisconsin Bell received from the investigator, Williams-Grant traveled to Lake Delton on October 2. Next, Wisconsin Bell became aware of a blog which stated that Williams-Grant was attending classes at the church on Saturdays, a day she was normally scheduled to work. Also, Texeira, Wisconsin Bell's labor relations manager, called the pastor of the Christian Faith Fellowship Church East, who informed her that Williams-Grant was taking classes at the church every Saturday since July 2009, including August 29, 2009.

In opposing summary judgment, Williams-Grant maintains that she can demonstrate a claim of retaliation in the wake of her request for FMLA leave. She argues that Solomon-Moore stated that "Linette is currently training and continued absences will have a negative

18

impact on her being successful in this position." However, the tardiness in question was not part of Williams-Grant's FMLA leave and was a year before the adverse employment actions, and therefore has no bearing on her FMLA claims.

Additionally, Williams-Grant claims that Solomon-Moore told her in 2008 that she did not have FMLA leave available, when in fact she did. However, Solomon-Moore stated that she was merely following the FMLA tracker which showed that Williams-Grant had no leave available.

On summary judgment, "Rule 56...requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983), *cert. denied,* 465 U.S. 1006 (1984). Williams-Grant provides no supporting evidence and provides no specific facts as to when this statement was made, why Solomon-Moore thought she did not have FMLA leave available, and whether she had FMLA leave available. Also, she provides only a conclusory statement which does not overcome Wisconsin Bell's explanation that Solomon-Moore relied on the FMLA leave tracker. More importantly, Williams-Grant admits that Wisconsin Bell never denied her FMLA leave in 2008.

Even if Williams-Grant had cited specific facts showing that Solomon-Moore's explanation that she was following the FMLA leave tracker was a pretext for discrimination, this statement does not establish that there is a genuine issue regarding whether, a year later, Wisconsin Bell had an honest suspicion that she was misusing her FMLA leave. As discussed above, only after having an "honest suspicion" that Williams-Grant was misusing her FMLA leave did Wisconsin Bell suspend and eventually terminate Williams-Grant's employment.

19

Wisconsin Bell presented additional arguments in support of summary judgment which this court need not address. Among these, Wisconsin Bell claims that Williams-Grant provided no evidence that she was in fact unable to work on the days in question. "Further, Bell has also failed to adduce evidence that establishes that he was incapacitated on those dates he claims that he was unable to work." *Bell v. Jewel Food Store*, 83 F. Supp. 2d 951, 960 (N.D. Ill. 2000). Wisconsin Bell makes a strong argument, as Williams-Grant cannot recall the medical conditions that necessitated FMLA leave on the dates in question nor can her doctor identify those conditions.

Lastly, Wisconsin Bell submits that Williams-Grant is barred from obtaining any damages by the doctrine of judicial estoppel. This argument is based on evidence that Williams-Grant has represented to the Social Security Administration that she has been unable to work from the day that she was suspended. However, this court need not determine this issue as Wisconsin Bell is entitled to summary judgment as discussed above. Accordingly,

IT IS ORDERED that Wisconsin Bell's motion for summary judgment (Doc. 23) is granted.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2013.

        BY THE COURT

        /s/ C.N. Clevert, Jr.
        C.N. CLEVERT, JR.
        U.S. DISTRICT JUDGE